Judge Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR-09-0084-MJP |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S |
| | ) | SENTENCING MEMORANDUM |
| v. | ) | RE: VIKTOR KOBZAR |
| | ) | |
| VIKTOR KOBZAR, | ) | |
| | ) | [Hearing Date: January 8, 2010] |
| Defendant. | ) | |
| | ) | |

## I.  INTRODUCTION

Defendant VIKTOR KOBZAR comes before the Court having pled guilty to conspiring to commit bank fraud, mail fraud, and wire fraud in violation of Title 18, United States Code, Section 371.  Defendant Kobzar's five co-conspirators, Vladislav Baydovskiy, Camie Byron, Alla Sobol, David Sobol and Sandra Thorpe all entered guilty pleas to the same charge.  Mr. Kobzar also pled guilty to filing a false personal income tax return. The seventh defendant, Donata Baydovskiy, entered a guilty plea to making a false statement in a matter occurring before the Department of Housing and Urban Development.  The false statement was made during the course of the charged conspiracy.  All six co-defendants have been sentenced.

The charged conspiracy arose from a scheme to defraud lending institutions into making mortgage secured purchase money and refinance loans.  An additional aspect of the scheme included defrauding otherwise unqualified prospective borrowers to secure purchase

Government's Sentencing Memorandum
Kobzar, Viktor
Kobzar et al., CR-09-0084-MJP - 1

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   money loans based on false and fraudulent representations.  The defendants profited from the

2   scheme by charging excessive fees and diverting some of the fraudulently obtained loan

3   proceeds to themselves.  The scheme succeeded in large part due to the defendants'

4   ownership and operation of both a mortgage loan brokerage business (Kobay and

5   Nationwide) and an escrow operation (Emerald City Escrow).  Defendant Viktor Kobzar's

6   role in the charged scheme spanned the entire term of the operation and included operating

7   both Kobay and Nationwide.

8                              **II.  FACTUAL BACKGROUND**

9          The facts and circumstances underlying the offense conduct for which Mr. Kobzar

10  pled guilty are summarized in the Plea Agreement and Presentence Report. (See Plea

11  Agreement, pp. 6-12; P.S.R. ¶¶ 14-35).

12         There are several additional facts the government believes should be considered by the

13  court in imposing a sentence sufficient, but not greater than necessary, to comply with the

14  purposes set forth in 18 U.S.C. § 3553(a).  While not included in the agreed statement, the

15  events and actions noted below relate to Mr. Kobzar's activities as a professional engaged in

16  the mortgage lending business.

17  **A.      Mr. Kobzar's Extensive Experience In The Mortgage Lending Business**

18         Mr. Kobzar pled guilty to participating in a mortgage fraud scheme that began "no later

19  than September 15, 2005."  In fact, Mr. Kobzar had been fully employed in the mortgage

20  lending industry as a loan officer and mortgage broker for approximately six years before

21  becoming an active participant in the charged, and agreed, scheme.  This prior experience

22  provided the foundation from which the scheme was developed.

23         Mr. Kobzar worked as a loan officer for two mortgage brokers before joining with co-

24  defendant Vladislav Baydovskiy to open Kobay Financial Corporation in 2000.  His prior

25  work experience paralleled Mr. Baydovskiy's.  According to information provided by Mr.

26  Kobzar, Kobay engaged in fraudulent activity from nearly the beginning of its business

27  operations.  False information related to prospective borrowers' qualifications was provided to

28

Government's Sentencing Memorandum
Kobzar, Viktor
Kobzar et al., CR-09-0084-MJP - 2

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    lenders in efforts to obtain mortgage backed residential real estate loans.  When asked by the

2    government to explain the fraud, Mr. Kobzar stated:[1]

3         MR. OESTERLE:  So then my sense is that this-- these fraudulent practices started
          when you started at Kobay, these are things you picked up on your own?
4
5         MR. KOBZAR:  Acubank, Kobay, uh, very little bit in Acubank because we-- I've
          done like I said two deals in Acubank.  Vlad done a lot more in Acubank.  But, uh,
          correct, in Kobay that's kind of where it all–
6
7         MR. OESTERLE:  Started?

8         MR. KOBZAR:  --started little by little.

9         MR. OESTERLE:  And is it something that you were necessary instructed on by Vlad
          or did you come up with some of this independently?
10        MR. KOBZAR:  It was kind of, uh, observed what's going on.  Uh, Vlad–

11        MR. OESTERLE:  Observed-- observed by you?

12        MR. KOBZAR:  By me, (Inaudible) myself.

13        MR. OESTERLE:  Okay.

14        MR. KOBZAR:  I observed of what's going on and kind of, uh, um, wanted to be
          "competitive" and successful and kind of all right how this is done, how is this done
15        and that's kind of where it got picked up from observing, uh, other people hinting, uh,
          doing and seeing it how it's done.
16
          MR. OESTERLE:  Within Kobay?
17
          MR. KOBZAR:  Within Kobay.
18
          MR. OESTERLE:  So they were your employees?
19
          MR. KOBZAR:  Um, a li-- employees weren't doing a lot of business.  If they were
20        doing a lot of business they weren't doing a good business, I'm–

21        MR. OESTERLE:  I mean, who were–

22        MR. KOBZAR:  --talking about clean files.

23        MR. OESTERLE:  Who were you observing that was doing this?

24        MR. KOBZAR:  We're talking about Vlad here.

25

26        [1]Excerpts from transcripts of recorded interviews conducted on August 3, 2009 and August 12,
     2009 between Viktor Kobzar and government investigators and prosecutors.  Copies of the transcripts
27   were included in discovery materials produced to the defendants.  The interviews were given pursuant to
     an agreement under which the parties acknowledged that the information would be available to the
28   sentencing judge.

Government's Sentencing Memorandum
Kobzar, Viktor
Kobzar et al., CR-09-0084-MJP - 3

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    MR. OESTERLE:  Okay.  Only Vlad?

2    MR. KOBZAR:  Correct.

3    Mr. Kobzar further offered a history of Kobay's business operations in California and

4  Oregon.  Those operations shed additional light on Mr. Kobzar's conduct in the charged

5  scheme prosecuted in this case.  According to Mr. Kobzar, he and Mr. Baydovskiy decided to

6  open an office in southern California under the Kobay name.  A similar operation was begun

7  in Arizona and a brokerage license was sought and obtained in the State of Oregon, although

8  no separate business location was opened in Oregon.

9    State regulators in both California and Oregon took administrative enforcement actions

10  against Kobay and Messrs. Kobzar and Baydovskiy personally for alleged fraudulent activity

11  associated with their mortgage brokerage operations.  Copies of the relevant pleadings are

12  attached to the Declaration of Silvia Reyes filed contemporaneously with the government's

13  sentencing memorandum for Mr. Baydovksiy.  Dkt. No. 232.  Mr. Kobzar offered the

14  following regarding Kobay's business practices in California:

15    MR. STEPHENSON:  How long was that [California] office  going?

16    MR. KOBZAR:  Four years.

17    MR. STEPHENSON:  Was there fraud on those deals too?

18    MR. KOBZAR:  A lot.

19    MR. STEPHENSON:  A lot of fraud?

20    MR. KOBZAR:  A lot, tons, maybe, uh, every file. ...

21    **B.    Mr. Kobzar Participates In Forming And Operating Nationwide**

22    Concern for lender reaction to the licensing and disciplinary issues in Oregon and

23  California subsequently led Messrs. Kobzar and Baydovskiy to explore alternatives to

24  continuing their mortgage brokerage business under the Kobay name.  Faced with the prospect

25  of losing lender options for placing loans, Messrs. Kobzar and Baydovksiy teamed with co-

26  defendant Alla Sobol, a former classmate and business contact of Mr. Baydovskiy's, to form a

27  new company.  As described by Mr. Kobzar, Nationwide Home Lending was formed to re-

28

Government's Sentencing Memorandum
Kobzar, Viktor
Kobzar et al., CR-09-0084-MJP - 4

1  establish business relationships damaged by a growing perception amongst lenders that Kobay

2  engaged in fraudulent practices:

3  MR. STEPHENSON:  Okay.  I-- I want to come back to this subject, um, but I-- I kind
   of want to get back to where we are chronologically and get back to the opening of
4  Nationwide and how Kobay closed here in Seattle if we can.
   But I definitely, we're going to revisit this topic.

5  MR. KOBZAR:  Okay.  Um, since, uh, Kobay Financial the name and then Viktor
6  Kobzar, Vladislav Baydovskiy who was in the-- on their radar, um, maybe some
   entities big time, some entities might be just beyond.

7  MR. STEPHENSON:  Why would it have been on the radar because of the fraud?

8
   MR. KOBZAR:  Yes.  Um, we knew that, uh, sooner or later, uh, Olympia would pull
9  our license or, um, something else would happen.  And we, Vlad and I decided to, uh,
   or mostly-- most of the time he is kind of thinking about, uh, leaving our names alone,
10 let it calm down, settle down, uh, let's move on from it, it has too much dirt let's just
   say.  And, uh, he knew Alla Sobol, uh, he knew from University of Washington where
11 they got-- they were, uh, going to the same school, they kind of met over there.  She
   also worked for Central Bank where she was account executive maybe a little bit even
12 higher then account executive, uh, for that, uh, bank.
   And she was, um, uh, le-- we got approved with her and the reason is because hey, uh,
13 she also found out Vlad is in the same industry so, uh, there was no issue getting a, uh,
   themselves approved or ourselves approved with that bank.
14 Uh, she would, uh, come in and, uh, spend time, uh, in the office, uh, they would have,
   uh, relationship, uh, friend-- friendly relationship, uh, between each other.  And, uh,
15 they got, uh, him and Alla got to know each other pretty good, uh, in the office, outside
   the office, maybe some eve-- events.
16 And, uh-- uh, we are very, uh, casual with her, friendly.  There were, uh, files that, uh--
   uh, we have to send to that company where she is working and she would take care of
17 it.  In other words, from rushing-- from rushing, uh, aspect to eve-- to a fraud aspect.
   You know, if something needs to be pushed she would be inside person to cover
18 things, uh, push things, uh, into funding, uh, stand over other peoples head make sure
   the-- the deal is funded.

19
   MR. STEPHENSON:  So you would send her deals knowing that she was going to, uh,
20 cover–

21 MR. KOBZAR:  Correct.

22 MR. STEPHENSON:  --the fraud that you guys have done?

23 MR. KOBZAR:  Correct.

24 MR. STEPHENSON:  Or commit fraud on her own?

25 MR. KOBZAR:  Um, yes.

26 MR. STEPHENSON:  Okay.

27 MR. KOBZAR:  Uh, because of the good relationship, personal relationship.

28 MR. STEPHENSON:  Right.

MR. KOBZAR: And we-- we were able to talk about it open, you know. So, uh–

MR. KOBZAR: So we knew, uh, we, uh, Alla, uh, was a familiar with Vlad, uh, then it got to know-- she got to know me like a business partner of Vlad. I'm sure he made me look good.

Um, then, uh, I've heard, uh-- uh, Alla Sobol is getting married I was like wow, okay. Um, the wedding was in New York. I was, uh-- uh, Vlad and I was invited. I wasn't invited formally like invitation or anything but just like she wants you to come too, okay.

Um, he went to the wedding, the wedding was in New York like I said, had party and everything, came back. And, uh, I believe she quit, uh, Central Bank at that time, I'm not sure exactly a time frame when she quit. Um, she had nothing else to do, she was bored I think. But, uh, the point is-- the point is, uh-- uh, Vlad is the person who would look for advantages and, uh-- uh, especially with people who he knows.

And, uh, he saw an opportunity that, uh, hey it looks like we are struggling here; we want to get a-- get over with Kobay Financial. Uh, our names let's just, uh-- uh, have Alla set up a totally brand new company license, name and, uh, get approved with banks all over again, uh, totally new company, new structure.

So, uh, I remember, uh, being in the office, uh, they were brainstorming what name to, uh, choose, came to conclusion Nationwide Home Lending. And--
...
MR. BLACKSTONE: Who was doing the brainstorming, you said you were in a meeting where people were brainstorming, who was there?

MR. KOBZAR: Uh, the three of us, Vlad, I and Alla.

MR. BLACKSTONE: You, Vlad and Alla? Okay.

MR. STEPHENSON: Okay. Uh, keep-- keep talking about kind of how it went from Kobay closing down and then?

MR. KOBZAR: So we decided on the name, uh, we went to-- uh, she did the licensing test, exams, tests, filling out all the paperwork. She did all that. Um, uh, I didn't help her out, she-- she knew paperwork pretty good. And, um, maybe I help maybe if she had some question hey what insurance company you used or, uh, I would tell her then she would use something else totally just to see if, uh, I knew certain-- she was probably brainstorming and, uh, I would, uh, let her know what I know.

And, uh, so the license was, uh, figured out. Uh, she passed exam. We went to Bank of America in, uh, Lake Hills and, uh, open up an account, all of us, the three of us, uh, on Nationwide Home Lending LLC. Uh, we each deposited, uh, I believe $10,000 each. That's, uh, for money to be used for, uh, you know, getting st-- uh, come-- getting company started, office supplies, maybe computers, maybe lease. Uh, just, uh, some kind of commitment.

And if there is a financial need in the future then, uh, that's the money we would be using. We set that up. There was a conversation I remember a couple of good conversations. Uh, Alla had, uh, had been stressing out, uh, who should be running, um, Kobay Financial, uh, accounting books, uh, money, managing, uh, checking, saving-- checking account, paying bills.

And, uh, there was an offer to hire an accountant, a totally different accountant so it's not in my hands Vlad's or Alla's, just have an accountant working in the office, maybe coming to the office, uh, um, you know, eight hours a week, uh, just to go through things, uh, maybe more, maybe less.

But that was the original idea and we were talking about it. First couple of days Vlad was– was like let her fume out, let Alla calm down, you know, talk talk talk and then

Government's Sentencing Memorandum
Kobzar, Viktor
Kobzar et al., CR-09-0084-MJP - 6

UNITED STATES ATTORNEY
700 Stewart Street, Suite S220
Seattle, Washington 98101-1271
(206) 553-7970

1   she talked everything out and then he would let it cool and then he would pursue with
    his own plan.
2   And that plan was him managing finances.

3   MR. STEPHENSON:  So he was the manager of all the finances?

4   MR. KOBZAR:  Yeah.  He was managing, uh, Kobay everything.  Kobay in
    California.

5
    MR. STEPHENSON:  He managed Kobay–
6
    MR. KOBZAR:  Kobay in Washington, uh, Kobay in Arizona and Nationwide Home
7   Lending.

8   MR. STEPHENSON:  Okay.

9   MR. KOBZAR:  Uh, it was on his computer one program QuickBooks, uh, password
    protected and that.  Um, so that issue he kind of convinced her that he knows tricks of
10  the trade I'll just say that.  In other words, he knows how to file in QuickBooks, how to
    get around certain, uh-- uh, bills, uh, certain pays.
11  Uh, he-- he is a-- he knew how to do it.  We'll just call-- we'll just say he was calling
    himself sometimes Master of Disaster.  And that's his words.  Um, but, uh, he, uh, from
12  a day one he knew that he would be running it.  It was just a matter of time of
    convincing her and, uh, doing it.  So he did his-- did his best, uh, (Inaudible) he
13  convinced her she agreed and he was running it.

14  **C.     Mr. Kobzar Continued Engaging In Fraudulent Conduct After The
           Charged Scheme Ended**

15      Emerald City Escrow ceased operations in late December 2008.  Alla Sobol unilaterally

16  forfeited her mortgage brokers license in October 2008, effectively terminating Mr. Kobzar's

17  ability to solicit loans using Nationwide.  The closure of Emerald City and Nationwide did

18  not, however, deter Mr. Kobzar from continuing his business partnership with Mr.

19  Baydovskiy as they employed many of the same fraudulent practices in continuing efforts to

20  obtain real estate loan proceeds.  Some of these efforts are summarized at paragraphs 10

21  through 15 in the Declaration of Silvia Reyes.  Dkt. No. 232.  While most of the references to

22  the events reported by Special Agent Reyes relate to Mr. Baydovskiy's conduct, Mr. Kobzar

23  candidly admitted his role in the scheme.

24      As explained by Special Agent Reyes, Messrs. Kobzar and Baydovskiy used the

25  identity and credit of a third party to apply for home equity lines of credit from several credit

26  unions over a span of several weeks in early 2009.  Mr. Kobzar acknowledged his

27  participation as follows:

28

1   MR. QUINN:  Who called all the, uh, credit unions?

2   MR. KOBZAR:  I did.

3   MR. QUINN:  You-- that was you on the phone?

4   MR. KOBZAR:  I did call credit unions.

5   MR. QUINN:  Did you tell them you were [I.V.]?

6   MR. KOBZAR:  Um, sometimes.

7   MR. QUINN:  Okay.

8   MR. KOBZAR:  Um, I initiated the application and then Vlad processed the applications.

9   MR. QUINN:  For the-- for the lines of credit?

10  MR. KOBZAR:  For the credit, yeah, that's correct.

11  The applications completed by Mr. Kobzar falsified the purported borrower's qualifications

12  and creditworthiness by inflating income and assets.  After a least two failed attempts, Messrs.

13  Baydovskiy and Kobzar succeeded in obtaining an approximately $200,000 loan.  The lender

14  has declared the loan a total loss.

15              **III.   ADVISORY GUIDELINE CALCULATION**

16          The parties' plea agreement does not include an agreed advisory guideline calculation

17  for either count of conviction.  The government agrees with the offense level computations

18  reached by the Probation Office and set forth at ¶¶ 43-63 of the Presentence Report.  In

19  accordance with those agreed computations, Mr. Kobzar's total adjusted offense level should

20  be 27.  The resulting advisory guideline range would be 70 to 87 months applying a criminal

21  history category of I.

22      **A.      A Reasonable Estimate Of The Loss For Guidelines Purposes Is More Than
              $2.5 Million But Not More Than $7.0 Million**

23          The parties have entered into a stipulation agreeing that the government can establish

24  an estimated loss amount attributable to the admitted fraud for purposes of calculating the

25  applicable offense level of between $2.5 million and $7.0 million.  The stipulation was sought

26  in the interest of avoiding a potentially protracted evidentiary hearing for the limited purpose

27

28

Government's Sentencing Memorandum
Kobzar, Viktor
Kobzar et al., CR-09-0084-MJP - 8

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  of establishing a reasonable estimate of the loss.[2]  Recognizing that the court must make its

2  own loss determination, the government offers the following legal points.

3  Absent the stipulation, the government anticipates that the Defendant would contest the

4  loss amount as preliminarily calculated by the Probation Office and the government.  While

5  the government readily concedes that establishing a precise loss amount may be problematic,

6  such precision is not required.  *See, e.g. United States v. Showalter,* 596 F.3d 1150, 1161 (9th

7  Cir. 2009)("a district court has a number of permissible methods for determining monetary

8  loss, and 'need not make its loss calculation with absolute precision.'") citing *United States v.*

9  *Zolp,* 479 F.3d 715, 719; *United States v. Garro,* 517 F.3d 1163, 1167 (9th Cir. 2008)("loss

10  need not be determined with precision, but need only be a reasonable estimate...given the

11  available information); *United States v. Miller*, 188 F.3d 1312, 1317 (per curiam) (11th Cir.

12  1999) (explaining that courts may reasonably estimate the amount of loss because  "often the

13  amount of loss caused by fraud is difficult to determine accurately.").  As discussed below, the

14  government's proffered loss amount attributable to the charged and admitted scheme is a

15  reasonable estimate supported by reliable and sufficient evidence.

### 1.    The Government's Proposed Methodology Is Consistent With The Guidelines And Ninth Circuit Authority

16
17  U.S.S.G. § 2B1.1(b)(1) provides for an increase in the base offense level based on the

18  loss amount.  Application Note 3(A) defines loss as "the greater of actual loss or intended loss

19  that resulted from the offense."  "'Actual loss' means the reasonably foreseeable pecuniary

20  harm that resulted from the offense."  Application Note 3(A)(I). "'Intended loss' . . . means the

21  pecuniary harm that was intended to result from the offense . . . and . . . includes intended

22  pecuniary harm that would have been impossible or unlikely to occur . . . ." Application Note

23  3(A)(ii).

24
25

26  [2] The stipulation specifically provides that it shall not apply to the judicial determination of restitution in this case. The parties are free to advocate for any amount of restitution, wholly independent
27  of the stipulated loss range.  In addition, evidentiary submittals offered to substantiate the agreed loss estimate for guidelines purposes are not to be cited to the court for purposes of challenging any proffered
28  claim for restitution.

Government's Sentencing Memorandum
Kobzar, Viktor
Kobzar et al., CR-09-0084-MJP - 9

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  As to determining the loss, "[t]he court need only make a reasonable estimate of the

2  loss." Application Note 3(C).  *See also United States v. Lutz*, 154 F.3d 581, 590 (6th Cir.

3  1998) ("In determining the loss for sentencing purposes, a district court need only make a

4  reasonable estimate of the loss, and this court reviews for clear error and reverses the

5  valuation only if it is outside the realm of permissible computations.") (citation omitted).[3]

6  In the case of collateral pledged or provided by the defendant, a credit must be applied

7  based on the fair market value or disposition amount of the collateral at the time of

8  sentencing.  Application Note 3(E)(ii).  Notably, this basis for reducing the amount of the loss

9  turns on the defendant's own efforts or own collateral, not the efforts or collateral of a third

10  party.

11  Courts have approved a common methodology for assessing a reasonable estimation of

12  loss in cases with mortgage fraud schemes employing practices similar to those used in this

13  case.  This methodology properly holds the mortgage fraudster responsible for the loan money

14  received as a result of the fraud, but appropriately deducts from the loss amount the fair

15  market value of the collateral, as suggested by Application Note 3(E)(ii) to U.S.S.G. §2B1.1.

16  This is the methodology recommended by the government and employed by the Presentence

17  Report to determine actual loss.

18  Subtracting the value of collateral at the time of sentencing from the mortgage loan

19  proceeds to determine actual loss to lenders was employed by the Eighth Circuit in *United*

20  *States v. Parish*, 565 F.3d 528 (8th Cir. 2009) in determining loss for sentencing purposes.

21  According to the court in *Parish*:

22  Pursuant to U.S.S.G. § 2B1.1, the equation used to calculate actual loss to the lenders
   is the amount of the fraudulently obtained mortgage loans minus any payments made

23  on the loan principal and the value of the collateral at the time of sentencing.  *See*
   U.S.S.G. § 2B1.1 app. n. 3 (E)(I) and (E)(ii).  The government submitted evidence to

24  the district court that the defendants fraudulently obtained 195 mortgage loans from
   twenty-four separate lending institutions, resulting in defendants receiving

25  approximately $85 million in loan proceeds.  Therefore, we take the amount of the loan

26  _____

27  [3] It is important to note that the loss calculations necessary to determine restitution under § 3663,
and the loss determination necessary for guidelines purposes under USSG § 2B1.1 are distinct.  The

28  purpose of restitution is restorative, to compensate the victims of the offense conduct for harm caused by
the defendants.

Government's Sentencing Memorandum
Kobzar, Viktor
Kobzar et al., CR-09-0084-MJP - 10

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   proceeds-$85,020,128-and subtract the value of the 195 homes built by PMDC and
2   used as collateral.

*Id.* at 535.  The government in *Parish* provided the district court with a comparative analysis
3   of the market value of comparable homes to those built by the defendant.  This value was
4   multiplied by the number of properties for which fraudulent loans had been obtained to
5   determine an approximate value of the collateral at the time of sentencing.

6        The First Circuit recently endorsed this approach of "first determin[ing] the total
7   amount of the loan issued for each of the flipped properties, and subtract[ing] from that
8   number the considerably lower amount the land-flippers paid for the piece of property in
9   question . . . [so that the] latter quantity serve[s] as a proxy for the true amount of the security
10  the lender held on the property."  *United States v. Innarelli*, 524 F.3d 286, 290-91 (1st Cir.
11  2008), *cert. denied*, 129 S.Ct 350 (2008).

12       The Ninth Circuit in *United States v. Allen*, 88 F.3d 765 (1996) presented useful
13  guidance for this court to follow in determining a reasonable estimation of loss.  Citing
14  decisions from other circuits, the court in *Allen* held that "actual loss" must take into account
15  the amount recovered or reasonably anticipated to be recovered from collateral that secured
16  the loan, and loan payments made prior to default.  *Id.* at 770 citing *United States v. Rothberg*,
17  954 F.2d 217, 219 (4th Cir. 1992) *United States v. Baum*, 974 F.2d 496, 499 (4th Cir. 1992);
18  *United States v. Smith*, 951 F.2d at 1167-68.

19       The district court in *Allen* found the minimum loss to be $70,255.75.  Based on the
20  record below, the court determined that this figure was derived from testimony finding the
21  gross loan value totaled $170,412.68; the proceeds realized from repossession and resale of
22  properties equaled $100,156.93; and the loan payments made prior to default totaled
23  $54,989.15.  Finding that the district court properly subtracted the resale proceeds from the
24  gross loan value, the court affirmed the loss determination of $70,255.75.

25       The defendant in *Allen* argued that the district court should also have subtracted the
26  $54,989.15 of loan payments made prior to default when calculating the actual loss, thereby
27  reducing the actual loss to $15,266.60.  Denying this argument, the court noted that the loan
28

Government's Sentencing Memorandum
Kobzar, Viktor
Kobzar et al., CR-09-0084-MJP - 11

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    payments had been credited by the bank towards interest, not principal.  Citing decisions from

2    other circuits approving of the inclusion of accrued interest as part of the actual loss

3    calculation, the court in *Allen* noted that the district court was not asked to include accrued

4    interest as part of the actual loss calculation.  88 F.3d at 771, citing *United States v. Gilberg*,

5    75 F.3d 15, 19 (1st Cir. 1996)(accrued interest included in the loss calculation under § 2F1.1);

6    *United States v. Henderson*, 19 F.3d 917, 928 (5th Cir.)(same), *cert. denied*, 130 L. Ed. 2d

7    137, 115 S. Ct. 207 (1994); *United States v. Jones*, 933 F.2d 353, 354-55 (6th Cir.

8    1991)(same); *United States v. Allender*, 62 F.3d 909, 917 (7th Cir. 1995)(same), *cert. denied*,

9    133 L. Ed. 2d 732, 116 S. Ct. 781 (1996); *United States v. Lowder*, 5 F.3d 467, 471 (10th Cir.

10   1993)(same); *contra United States v. Hoyle*, 33 F.3d 415, 419 (4th Cir. 1994)(loss calculation

11   under § 2F1.1 should not include accrued interest), *cert. denied*, 130 L. Ed. 2d 892, 115 S. Ct.

12   949 (1995.  The court found that had the district court included the accrued interest, then

13   interest payments made prior to default would have been taken into account. See U.S.S.G. §

14   2F1.1 comment. (n.7(b)) ("the loss is the amount of the loan not repaid. . ."); *Rothberg*, 954

15   F.2d at 219; *Baum*, 974 F.2d at 499; *Smith*, 951 F.2d at 1167-68. The district court in *Allen*

16   used only the loan principal to calculate the "amount of the loan"; it did not consider the

17   accrued interest.  Using this approach, payments made towards interest could not be

18   considered as repayments made on the loan.  The court affirmed the district court's exclusion

19   of the $54,989.15 in interest payments from the loss calculation.

20          Similarly, the court in *Allen* affirmed the district court's refusal to consider the interest

21   proceeds from the non-defaulting loans.  The defendant argued that the court should have

22   considered the interest income from these loans claiming it was inconsistent to aggregate

23   losses from defaulting loans and ignore gains from non-defaulting loans.  The court affirmed

24   the district court's rejection of this argument.  Finding the calculations consistent, the court

25   noted that the district court did not include as part of the loss the interest income the bank lost

26   as a result of default, and therefore did not set off against the loss the interest income received

27   from non-defaulting loans.  Contrary to the defendant's argument, the court found it was the

28   lost interest income associated with the defaulting loans, not the amount of the unpaid

1   principal, that is the counterpart of the interest income derived from the non-defaulting loans.

2   The interest income lost on the defaulting loans was not included.  Therefore, interest income

3   from the non-defaulting loans should not have been included either.

4        Finally, in a determination applicable to this case, the court in *Allen* ruled that the

5   district court also correctly refused to include payments made on current outstanding loans.

6   For these loans, the risk of default on the then current loans was offset by the current and

7   prospective amount of income to be collected.  Recognizing the difficulty of accurately

8   estimating the default risk and factoring it into the loss calculation, the court concluded that

9   any prospective income should not be considered.  88 F.3d at 771, citing *Smith*, 951 F.2d at

10  1169 and *United States v. Hughes*, 775 F. Supp. 348, 351 (E.D. Cal. 1991).  Finding that the

11  district court's determination that future losses and profits were too speculative to consider

12  was not clearly erroneous, the court in *Allen* concluded that it was inappropriate to consider

13  the loan payments made on the outstanding current loans.  *Id.*

14       In summary, the guideline application notes, as applied by the courts, advocate

15  applying the following methodology to the loss determination in this case:

16       -    Aggregate the gross loan value of all loans procured by the defendants during

17            the pendency of the charged scheme provided the identified loans were obtained

18            using one or more fraudulent representations;

19       -    Deduct the gross loan value of all loans for which the lender or loan servicing

20            company is not currently reporting a loss or the borrower is not in default;

21       -    Deduct the fair market value of the pledged collateral (measured at or about the

22            time of sentencing) from the aggregate value of all fraudulently obtained loans

23            that were either foreclosed or are presently in default status; and

24       -    Do not include as part of the loss the interest income the lender lost as a result

25            of default and do not set off against the loss the interest income received from

26            non-defaulting loans.

27

28

Government's Sentencing Memorandum
Kobzar, Viktor
Kobzar et al., CR-09-0084-MJP - 13

1
2

**2.      There Is Sufficient and Reliable Information To Support A Reasonable Loss Estimation Of More Than $2.5 Million But Less Than $7.0 Million**

3       The government relies on the previously filed Declaration of James C. Vach as
4  evidence supportive of a reasonable loss estimation of more than $2.5 million but likely less
5  than $7.0 attributable to the charged and admitted mortgage fraud scheme.  Dkt. No. 211.  As
6  noted in the Declaration, Mr. Vach is a Consumer Fraud Analyst employed by the United
7  States Postal Inspection Service.  He has actively contributed to the government's
8  investigation and prosecution of this mortgage fraud scheme.  One of the tasks he undertook
9  was to contact all of the lenders identified by the government as extending one of seventy-
10 three (73) loans known to have been obtained using fraudulent representations.  The
11 fraudulently obtained loans were listed in a document entitled "Fraud Book."  The Book, a
12 copy of which is attached to the Declaration as Exhibit A, formed the basis of the charged
13 scheme and was provided in discovery to all the defendants.

14       Mr. Vach's declaration details his efforts to identify the current lender or loan servicing
15 company for each of the identified loans.  Vach Dec. at ¶ 4.  Each identified lender or
16 servicing company was asked to provide current information regarding the loan status.  For
17 those loans identified as being in default status, the lender or servicing company was asked to
18 provide the current fair market value of the property.  Applying the methodology discussed in
19 the preceding section, Mr. Vach assembled the requested information in a second document
20 entitled "Losses from Lenders."  The loss document, a copy of which is attached to the
21 Declaration as Exhibit B, was provided to all of the defendants.  In addition, all of the
22 defendants were given copies of documentation received from the lenders and servicing
23 companies to substantiate the losses.  The government is unaware of any similar efforts being
24 undertaken by the defendants, either collectively or individually.

25       As candidly admitted above, the government's proffered loss estimate is not precise.
26 The guidelines and applicable case law do not, however, require precision.  They merely
27 require a reasonable estimation.

28

Government's Sentencing Memorandum
Kobzar, Viktor
Kobzar et al., CR-09-0084-MJP - 14

**B.      The Scheme To Defraud Involved Ten (10) Or More Victims**

Both the government and the Probation Office contend the two (2) level enhancement authorized by USSG §2B1.1.(b)(2)(A) is applicable because the charged and agreed scheme involved ten (10) or more victims.  As noted in the Declaration of James C. Vach, the government identified twelve (12) lenders who extended loans on the basis of false and fraudulent information submitted by those participating in the scheme.  Vach Declaration at ¶ 3;  Dkt. No. 211.  Information recently developed to assist the court in establishing a reasonable estimate of the losses attributable to the fraud scheme identified ten (10) lenders or servicing companies reporting losses from loans extended on the basis of false and fraudulent information.  Vach Declaration at ¶ 5; Second Declaration of James C. Vach at ¶ 4; Dkt. No. 216.

**C.      Defendant Kobzar Was An Organizer Or Leader Of The Scheme**

The government anticipates that Mr. Kobzar will argue that he was neither a leader nor an organizer of the scheme to avoid application of the four (4) level aggravating role enhancement.  This argument is inconsistent with both the agreed facts and the supplemental facts discussed in section II above.  Mr. Kobzar was a co-owner of Kobay and was instrumental in forming Nationwide.

**IV.   RECOMMENDATION & JUSTIFICATION**

**A.      Criminal Fine, Restitution, Supervised Release**

The government believes that Mr. Kobzar lacks the necessary resources to pay both a criminal fine and the mandatory restitution obligation to be sought by the government.  Consequently, the government will not oppose a request that the fine be waived.

The charged conduct to which Mr. Kobzar pled guilty involved offenses "committed by fraud or deceit," imposing a mandatory restitution obligation.  18 U.S.C. §3663A(c)(1)(A)(ii).  Section 3663A(d) of the Mandatory Victim Restitution Act provides that "[a]n order of restitution under [the Act] shall be issued and enforced in accordance with section 3664.  18 U.S.C. § 3663A(d).  Determining the appropriate restitution amount in this case presents some

Government's Sentencing Memorandum
Kobzar, Viktor
Kobzar et al., CR-09-0084-MJP - 15

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  legal and factual issues requiring supplemental briefing and testimony.  This court has

2  scheduled a joint restitution hearing for January 29, 2010.

3      Finally, the government concurs with the Probation Office's recommendation to

4  impose a three year term of supervision.  Three years of oversight is necessary to reduce the

5  likelihood of recidivism.

6      **B.      Term of Imprisonment**

7      In consideration of the following factors set forth in 18 U.S.C. § 3553(a), together

8  with an advisory guideline range of seventy (70) to eighty-seven (87) months as advocated by

9  the government and the Probation Office, the government recommends that this Court

10  sentence Mr. Kobzar to sixty (60) months of imprisonment on the conspiracy charge to run

11  concurrently with twelve (12) months on the tax charge.

12      **1.      The Nature and Circumstances of the Offense**

13      The means employed by Mr. Kobzar and his co-conspirators to perpetrate the mortgage

14  fraud scheme charged in this case were not unique.  To the contrary, federal and state

15  prosecutors nationwide are investigating and have charged numerous schemes involving the

16  same, or similar, deceptive acts. http://www.fbi.gov/publications/fraud/mortgage_fraud08.htm.

17  The tremendous scale of the problem has led many to label mortgage fraud as a significant

18  contributor to our nation's financial problems.  Fraud perpetrated by those involved in the

19  mortgage lending industry has caused massive losses to lenders and is responsible for the failure

20  of banks and private lending institutions.  Investors in mortgage backed securities have lost

21  funds needed for income and retirement.  Home values have been distorted by inflated

22  appraisals leading to a shortage of affordable housing.  Foreclosures caused by mortgage fraud

23  have riddled neighborhoods with abandoned houses and properties in disrepair.

24      A consistent sustained increase in home values led to relaxed loan underwriting

25  standards.  Loan applications, appraisals, and real estate closing documents were not closely

26  scrutinized because the residential real estate industry assumed the rising real estate values

27  would insure that lenders would recoup their funds from the sale of the home if they had to

28

Government's Sentencing Memorandum
Kobzar, Viktor
Kobzar et al., CR-09-0084-MJP - 16

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  foreclose.  In addition, it was assumed that homeowners unable to afford their mortgage

2  payments would simply re-finance based on the ever increasing value of their homes.

3  Several professionals in the residential real estate industry, including Mr. Kobzar and his

4  co-defendants in this case, seized on opportunities presented by these market conditions.  They

5  took advantage of the limited scrutiny and a rising market by orchestrating real estate

6  transactions using fraudulently inflated prices, falsified borrower qualification documents, and

7  sham closings to divert loan proceeds to themselves.  Lenders were left with both unqualified

8  borrowers lacking the resources to honor their loan commitment, and overvalued properties to

9  securitize the debt.  The well documented collapse of the residential real estate market exposed

10 the fraud.  Lenders could no longer look solely to the pledged properties to recover their losses.

11 The government anticipates that Defendant Kobzar may argue that decreased scrutiny in

12 the residential real estate lending markets mitigates his culpability.  Any suggestion that this

13 Court should discount a particular defendant's personal responsibility for preparing and

14 submitting fraudulent documents and making false representations in an orchestrated effort to

15 obtain loan proceeds should be summarily denied.  There is no basis in the law or equity for the

16 proposition that criminal conduct be excused because the victim failed to take adequate

17 measures to protect themselves or their property.  The relaxed underwriting standards employed

18 by lenders prior to collapse of the residential real estate market were neither an invitation to

19 commit fraud nor an excuse for those unscrupulous enough to steal.

20 The particular scheme charged and admitted to by Mr. Kobzar, while not unique in its

21 methodology, required the collaborative efforts of mortgage brokers, loan officers, accountants,

22 and escrow closers.  Each played a vital role in developing, implementing and perpetuating the

23 scheme.

24  **2.    History and Characteristics of the Defendant**

25 Mr. Kobzar has extensive experience in the mortgage lending business.  Drawing on

26 their collective experience as loan officers in the late 1990s, Messrs. Kobzar and Baydovskiy

27 formed Kobay Financial Corporation.  As discussed above, many of the fraudulent practices

28

Government's Sentencing Memorandum
Kobzar, Viktor
Kobzar et al., CR-09-0084-MJP - 17

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

comprising the charged scheme in this case were practiced from the outset of Kobay's operations in 2000. These practices continued unabated for over eight years.

Faced with increased scrutiny from state regulators and a loss of lender options due to documented instances of fraud, Messrs. Kobzar and Baydovskiy were undeterred. They simply chose to continue their business operations under a new name. They brought in a new business partner, co-defendant Alla Sobol, and began conducting business under the Nationwide Home Lending name. They used Ms. Sobol's newly obtained mortgage broker's license in an effort to distance themselves from Kobay and responsibility for the fraudulent practices ascribed to its operations.

Adoption of the Nationwide name and their new affiliation with Ms. Sobol did not cause Messrs. Kobzar or Baydovskiy to alter the way in which they conducted their mortgage brokerage business. To the contrary, Mr. Baydovskiy and Ms. Sobol formulated the plan to start an escrow company to close the loan transactions they were brokering. The introduction of Emerald City Escrow as a means of diverting fraudulently obtained loan proceeds merely completed the scheme. While Mr. Kobzar was not directly involved in the formation and operation of Emerald City, he did use its services to close real estate transactions involving fraudulently obtained loan proceeds.

Finally, Mr. Kobzar's conduct in early 2009 following the closure of Emerald City and cessation of the charged scheme should be factored into this court's assessment of his character. Unlike the actions of co-defendant Alla Sobol, who affirmatively withdrew from the scheme in the fall of 2008, Mr. Kobzar continued using many of the same fraudulent practices to solicit and obtain additional loan proceeds. As outlined in the Declaration of Silvia Reyes, Mr. Kobzar assisted his co-defendant, Mr. Baydovskiy, in submitting fraudulent applications to at least three credit unions in early 2009. Unable to broker mortgage loans because both he and Mr. Baydovskiy lacked the required license, he exhibited his resourcefulness by falsifying the qualifications of I.V., a third party, to obtain a $200,000 home equity line of credit. The line of credit was immediately drawn down and the loan is now a total loss.

Government's Sentencing Memorandum
Kobzar, Viktor
Kobzar et al., CR-09-0084-MJP - 18

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Mr. Kobzar's participation in the charged scheme was, in most respects, indistinguishable from that of his long time business partner and co-defendant, Vladislav Baydovskiy. While Mr. Kobzar exhibited a more reserved demeanor, he practiced the same fraudulent means used by his partner in their collective quest to steal from lenders using false information. The similarities between the two extended to their spending habits, with both purchasing expensive luxury cars and condominium units in the same high rise building in downtown Bellevue.

As noted in the parties' Plea Agreement, Mr. Kobzar agreed to cooperate fully in the government's investigation of the charged scheme. He has honored that commitment by providing information related to the activities of his co-defendants as well as others in the mortgage industry.

### 3. Reflect Seriousness of Offense, Promote Respect for the Law, and Provide Just Punishment

As noted in sub-section 1 above, the mortgage fraud scheme perpetrated by Mr. Kobzar and his co-conspirators was largely successful due to relaxed oversight by lenders. Lenders relied, to their detriment, on the truthfulness of representations made by Mr. Kobzar and his co-conspirators regarding a borrower's purported qualifications and the value of the properties to be pledged as security for the fraudulently obtained loans. Motivated by simple greed and the perceived reduced risk of detection, Mr. Kobzar and his colleagues were undeterred by ethical constraints to make true and accurate representations regarding property values and a prospective borrower's creditworthiness.

The recommended sixty (60) month term of imprisonment would signal to the entire real estate industry the seriousness with which fraudulent practices will be sanctioned. The standards of honesty and transparency so readily abused and ignored by Mr. Kobzar in this case would best be served by a significant term of imprisonment. Judicial recognition that dishonest business practices will not be excused regardless of "market conditions" would be underscored by imposing the requested sentence.

Government's Sentencing Memorandum
Kobzar, Viktor
Kobzar et al., CR-09-0084-MJP - 19

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

### 4.    Afford Adequate Deterrence to Criminal Conduct

The government believes that this prosecution, together with a custodial sentence of the requested duration, should deter Mr. Kobzar from engaging in further criminal conduct.  An equally important consideration, however, is the deterrent effect this prosecution and the resulting sentences will have on the broader real estate and mortgage lending industries.  As discussed above, countless others employed in the mortgage lending industry profited from using many of the same fraudulent practices prosecuted in this case.[4]

These professionals presumably engaged in a risk analysis, concluding that the threat of detection and accountability was outweighed by the loan proceeds so readily stolen from lenders and unwitting borrowers.  The significant term of imprisonment sought by the government for Mr. Kobzar would signal to others in the industry an increased risk to engaging in similar fraudulent conduct, tipping the balance in favor of honest and transparent business dealings.

### 5.    Avoid Unwarranted Sentence Disparity Among Defendants

This court sentenced defendants Alla Sobol, David Sobol, and Camie Byron to twenty-four (24) month terms of imprisonment.  The government had sought a forty-eight (48) month term for Ms. Sobol based in large part on her role as a leader and organizer of Nationwide and her recruitment of her husband to manage Emerald City Escrow.  The court sentenced defendant Vladislav Baydovskiy to sixty (60) months of imprisonment on the conspiracy charge to run concurrently with six (6) months on the tax charge.  The government had requested a seventy-eight (78) month term.

As discussed above, Mr. Kobzar's role in the scheme to defraud was virtually indistinguishable from that of his long time partner, Mr. Baydovskiy.  Both engaged in the same fraudulent practices and shared equally in the proceeds of their criminal conduct.  Mr. Kobzar

---

[4]The Mortgage Asset Research Institute's March 2009 report to the Mortgage Bankers Association reports that "fraud incidence is at an all-time high," and "[e]merging fraud trends are further draining lender, law enforcement, and consumer resources in the industry's most challenging times." http://www.marisolutions.com/resources-news/press-release-20090316.asp There were 63,713 mortgage fraud related suspicious activity reports filed with FinCEN in fiscal year 2008, compared to 17,127 such reports in fiscal year 2004 --an increase of 370%.

Government's Sentencing Memorandum
Kobzar, Viktor
Kobzar et al., CR-09-0084-MJP - 20

1  was not involved in the formation of Emerald City Escrow but he benefitted from access to a

2  "captive" escrow company to further the fraud scheme and avoid detection.

3   When viewed in its entirety, the government believes the material before this court

4  supports the conclusion that Mr. Kobzar was an undisputed leader of the scheme.  He teamed

5  with Vladislav Baydovskiy to embark on a calculated pattern of fraud to steal loan proceeds

6  from multiple lenders over an eight year time span.  Those efforts are worthy of the same

7  sanctions imposed upon Mr. Baydovskiy.

8  ## V.  CONCLUSION

9   The mortgage fraud scheme perpetrated by Mr. Kobzar and his co-defendants took

10  advantage of market conditions that enabled those motivated by dishonest intentions to reap

11  significant benefits with very little risk of detection.  Fueled by greed, without any apparent

12  regard for ethical business dealings, Mr. Kobzar and his co-defendants were undeterred in their

13  collective pursuit for fraudulent loans.  It was not until the near collapse of the real estate

14  markets and the corresponding tightening of lending standards that the defendants' activities

15  were slowed.  The sentence this court will impose on Mr. Kobzar provides an opportunity to

16  send the message that mortgage fraud, particularly those who lead intricate schemes to defraud,

17  will be sanctioned as serious criminal conduct.  The government's recommended sentence

18  accomplishes this objective.

19   DATED this 4th day of January, 2010.

20

21   Respectfully submitted,

22   JENNY A. DURKAN
 United States Attorney

23

24   /s/ James D. Oesterle
 JAMES D. OESTERLE
 WSBA # 16399

25   Assistant United States Attorney
 United States Attorney's Office

26   700 Stewart Street, Ste. 5220
 Seattle, WA 98101

27   Facsimile:  206-553-2502
 Phone:  206-553-5040

28   E-mail: jim.oesterle@usdoj.gov

Government's Sentencing Memorandum
Kobzar, Viktor
Kobzar et al., CR-09-0084-MJP - 21

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 4, 2010 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorney(s) of record for the defendant(s).

*/s/ Kimberly King*
KIMBERLY KING
Legal Assistant
United States Attorney's Office
700 Stewart Street, Ste. 5220
Seattle, Washington 98101
Phone: (206) 553-5127
Fax:   (206) 553-2502
E-mail: Kimberly.King3@usdoj.gov

Government's Sentencing Memorandum
Kobzar, Viktor
Kobzar et al., CR-09-0084-MJP - 22

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970